MEMORANDUM OF DECISION
This is an action for termination of parental rights brought by the Commissioner of the Department of Children and Families ("DCF"). CT Page 15267
The respondents, Maria P. and Magdiel E., are the biological parents of Deana, Yaritza and Magdiel. Maria P. and Celso S. are the biological parents of Celso, Cesar and Amarilys.
PROCEDURAL BACKGROUND
On August 22, 1995, DCF filed neglect petitions regarding Deana, Yaritza, Magdiel, Celso and Cesar, alleging that the children were being denied proper care and attention physically, educationally, emotionally or morally and that the children were being permitted to live under conditions, circumstances or associations injurious to their well being. Conn. Gen. Stat. §46b-120 (8)(B) and (C).
On October 2, 1995, Maria gave birth to a sixth child, Amarilys.
On October 6, 1995, DCF requested and the court entered an Order of Temporary Custody with regard to all six of the children.(Driscoll, J.) DCF also filed a neglect petition regarding Amarilys.[2]
On February 4, 1997, all six of the children were committed to the care and custody of the Commissioner of the Department of Children and Families as neglected children.
On August 19, 1998, DCF filed a petition for the termination of parental rights of Maria P., Celso S., and Magdiel E.
With regard to Maria P., DCF alleged that the children had been found in a prior proceeding to have been neglected and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in the life of the children. Conn. Gen. Stat. § 17a-112 (c)(3)(B).
With regard to Magdiel E., father of Deana, Yaritza and Magdiel, the petition alleged that he had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, he could assume a responsible position in the lives of the children. The petition also alleged that there is no ongoing parent-child relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis, CT Page 15268 the physical, emotional, moral or educational needs of the children and to allow further time for the reestablishment of the parent-child relationship would be detrimental to the best interest of the children. Conn. Gen. Stat. § 17a-112 (c)(3)(D). Finally, with respect to this father, the petition also alleged that the children have been abandoned in the sense that he has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children. Conn. Gen. Stat. § 17a-12 (c)(3)(A).
With respect to Celso S., father of Celso, Cesar and Amarilys, the petition alleged that the children have been found, in a prior proceeding, to have been neglected and the father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children he could assume a responsible position in the life of the children. The petition also alleged abandonment and no ongoing parent-child relationship. At the conclusion of the trial, the petitioner withdrew the claim of abandonment against Celso.
The court finds that there is no proceeding pending in any other court affecting the custody of the children.
FACTUAL FINDINGS
The court heard testimony over five days and received into evidence a social study, court approved expectations, arrest and conviction records, a list of services provided, a list reflecting visitation, numerous evaluations and various other documentary evidence.
The court makes the following findings by clear and convincing evidence.
On March 10, 1995, DCF received a referral regarding Deana from her school. Deana had been beaten with an electrical cord by Celso S.[3] It was determined during the subsequent investigation that Deana, Yaritza and Magdiel had been severely beaten with an electrical cord by Celso because they had failed to stop jumping up and down on a bed after he had asked them to stop doing so. When DCF went to question Maria and Celso in March of 1995, the condition of the home was filthy, there were cockroaches and piles of clothes everywhere, and there were no mattresses or sheets for the children. CT Page 15269
In order to prevent having her children removed, Maria entered into a service agreement with DCF agreeing that Celso S. would move out of the home for a period of time and would not have contact with the children. As a result of the beating incident, Celso S. was arrested on charges of two counts of Assault 2, three counts of risk of injury and one count of Assault 3. As part of the criminal proceeding, a restraining order was entered on March 21, 1995, which provided that Celso was not to have any contact with the children while his criminal case was pending. In violation of this order, Celso S. began seeing the children and Maria within a week and continued to physically abuse Deana, Yaritza and Magdiel. On April 22, 1995, Celso S. struck Magdiel on the top of his head. Swelling was still evident a week later. It is unexplained why DCF did not seek an order of temporary custody at that time or report the incident to the police. The children have revealed in therapy that after Celso was ordered out of the home he continued to beat them when Maria and he would have contact in violation of the court order. Celso was convicted on August 2, 1995 on one count of Assault 2 and one count of risk of injury.
Maria received intensive family preservation services between April 1995 and August 4, 1995. The final report states that mother was unsuccessful in completing any of her goals. According to the report, mother "showed little interest in changing her method of discipline." Little progress was achieved in developing a budget plan. The home remained filthy and infested with mice and roaches. Finally, mother failed to develop a daily routine for the children such as waking up in time for school.
An Order of Temporary Custody was granted on October 6, 1995, after Maria left the children with an inappropriate care giver whose own child had recently been removed because of physical abuse. In addition, Magdiel reported that on the prior weekend Celso S. pushed him against the wall several times which caused a large bump on his head. Deana stated that on that same weekend, Celso S. had hit her on her back, legs and hands with the wire and that he had done this on prior visits. Finally, Yaritza reported that Celso S. had also hit her on the back, legs and hands with the wire on numerous occasions. The children all confirmed that their mother had not kept the children away from Celso S.
After the children were removed Maria was provided with CT Page 15270 numerous services. Specifically, she engaged in and completed the parent aid program between September 6, 1995 and June 30, 1997. She completed a play therapy program which took place between October of 1995 and January of 1997. She engaged in couples and individual counseling between November of 1995 and June of 1996. She received individual counseling between June of 1996 and June of 1997. She completed a woman's support group and parenting classes at the Winthrop Family Support Center between October of 1995 and January of 1997. She engaged in family therapy at the child guidance clinic between November, 1995 and April, 1996. She engaged in other parenting classes at Family Services between September, 1996 and January, 1997. She took part in a mentoring program beginning in February of 1997. She also received intensive family preservation services aimed towards reunification between June of 1997 and January of 1998.
While placed in foster care the children were engaged in counseling. As part of the counseling process, the children revealed other atrocities that had occurred. Aside from numerous beatings by Celso S., Yaritza revealed that her mother had beaten her and on one occasion hit her over the head with a hammer which resulted in her having to receive five stitches. Yaritza also revealed that, on more than one occasion, the children were locked in a single room all day without any food or even toys. Finally, she stated that on the occasions when her mother would try to intervene when Celso was beating her up, he would also beat Maria.
Deana revealed that she used to have to do the cooking for the children. On one occasion when her mother was not pleased with what she had cooked, Maria threw the food on the floor, at which point Deana was beaten by Celso S. with an electrical cord.
In addition, when Magdiel went into foster care, he was a very small child with bald spots on his head and white spots on his face which are all indicative of severe malnutrition. In foster care his hair began to grow in, he grew, and the spots disappeared. Magdiel also revealed that his mother had spanked him with cables.
In sum, while living with their mother and Celso S., the children were subjected to ongoing, pervasive physical and emotional abuse and neglect.
CELSO S.
CT Page 15271
Celso S. was also offered extensive services but chose to not take advantage of the numerous opportunities he was given to improve his parenting skills. He was offered but did not take part in a parent aid program which commenced in September of 1995. He was also referred to Winthrop Family Support Center for anger management counseling and a men's support group in October of 1995. He did not complete this program. He received couples counseling until he moved to Puerto Rico in the spring of 1996. He was also referred to a men's support group and English as a second language program which was offered in December of 1996. Celso did not complete this program. He was also offered individual counseling through Catholic Charities in 1997 but did not attend. He also failed to attend classes at the Institute for Hispanic Families.
Between May and August of 1996, Celso S. moved to Puerto Rico as part of a plan with Maria that she would join him after DCF returned the children to her. However, while he was in Puerto Rico, Maria began a relationship with a new man, Jorge R. When Celso realized this he moved back to Connecticut. He then moved to Vernon, Connecticut which was over one hour away from where the children were living.
MAGDIEL E.
Magdiel E. had a relationship with Maria which began in the early 1980s and ended sometime in the early 1990s. Maria has admitted that there was domestic violence in the form of emotional and physical abuse by Magdiel. He has a lengthy prison record beginning in 1981. Magdiel began serving a six year sentence on drug charges in 1991. After being released on probation, he violated his conditions of probation and was incarcerated again between October 6, 1995 and April 9, 1997. He was again incarcerated for periods in January, February, March and April, 1998 on larceny charges. He has remained incarcerated from July 22, 1998 until the present on burglary, larceny and failure to appear convictions. His discharge date from prison is scheduled for November of 1999. Magdiel E. has not played a part in his children's lives. One social worker did testify that she had a conversation with Magdiel while he was in prison in February of 1997 regarding how he could go about seeking visitation. Magdiel never followed up on this discussion. He did, however, stop by the children's foster home several times in the spring and summer of 1997. The foster mother told him he needed CT Page 15272 to contact DCF to arrange formal visitation. He did not follow up on this discussion either.
Despite the fact that DCF had Magdiel E.'s incarceration record, and had constructive notice where he was during the multiple times that he was incarcerated, no specific steps were ever provided to him. In addition, visitation was never formally offered to him. However, Magdiel E. knew that his children were in a foster home and knew he needed to contact DCF if he wanted to become involved in their lives. He failed to do so. Since June of 1999 he has been present at the court proceedings and was represented by counsel throughout the trial.
FAILED REUNIFICATION EFFORT
On October 31, 1997, as part of the DCF reunification plan, Celso and Cesar were reunified with their mother who was now living with Jorge R. Amarilys was subsequently reunified with her mother on December 25, 1997. The mother had signed an agreement with DCF that she would provide appropriate supervision, refrain from using physical discipline and provide a safe, stable and nurturing environment for her children. The children were returned because mother had completed all of the numerous programs that she had been referred to by DCF. Unfortunately, in this case, there was a distinct difference between attending the programs and learning and benefitting [benefiting] from them.
On January 8, 1998, DCF received a referral regarding the child Celso. Maria had told one of the therapists at Child Guidance that she could not come to her appointment that day because Celso had been beaten by a tall black man. When DCF went to the school they found that Celso was not in school and had not been in school on January 7, 1998 either. When the DCF worker arrived at Maria's apartment, she found the child had a large bruise in the shape of an adult hand print on his cheek. The mother stated that a child named Gabby, who was approximately eight years old, had hit Celso when she left the child with a babysitter who had not been approved of as a caretaker by DCF. Upon investigation, it further turned out that this babysitter had an open case with DCF due to alleged drug activity and neglect. When questioned by the worker the child changed his story from saying that it was Gabby to then saying it was a tall white male.
A doctor who examined Celso found numerous contusions on his CT Page 15273 face, back, thigh, and a bruise in the shape of an adult shoe print on the child's buttocks. When the babysitter, Doris, was questioned, she confirmed that she had been babysitting for Celso on January 6, 1998. She stated that the child had no bruises when Jorge picked up the child at approximately 6:30. Significantly, Jorge confirmed he did not observe any bruises on the child when he picked him up at the babysitter's house. When Jorge came to pick up Celso, Doris reported to Jorge that Celso had engaged in sexualized behavior and made several inappropriate comments. In front of Doris, Jorge slapped the child on the mouth and told the babysitter he would take care of the problem at home.
Ultimately, Maria stated that she did not know how the child had gotten the bruises. While Celso would not confirm that Jorge had done the beating, he did state that Jorge was always mean to Celso and yelled at him constantly.
On January 9, 1998, the three children were again removed from their mother's care.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court find in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding however, "if a court has determined at a hearing pursuant to subsection (B) of § 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate. Id. On February 23, 1999, at a commitment extension hearing, the court made the requisite finding that further efforts to reunify the parents with their children were not appropriate. This court has no record reflecting the evidence presented or the reasoning of the court in making its decision that reunification efforts were no longer appropriate. In the absence of any such record, there is no basis for setting aside the court's finding.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights CT Page 15274 case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exist. See In reMichael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. §17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is August 19, 1998.
FAILURE TO REHABILITATE
A statutory ground for termination arises when "the parent of a child who (1) has been found by the superior court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B)(1). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." In re Luis C.,210 Conn., 157, 167 (1989).
No dispute exists that the court has previously found the children to have been "neglected" thus satisfying a statutory prerequisite. The rest of the statute requires the court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The primary issue for adjudication before this court then is whether the respondents are better able to resume the responsibilities of parenting at the time of filing the termination petition then they had been at the time of the children's commitment on February 4, 1997. In reMichael M., 29 Conn. App. 112, 126 (1992); In re Hector L.,53 Conn. App. 359, 367 (1999).
With regard to the mother, Maria, the court finds by clear and convincing evidence that she has failed to rehabilitate within the meaning of Conn. Gen. Stat. § 17a-112 (c)(3)(C).
When the children were initially taken away from Maria in October of 1995, she was offered and attended all of the extensive services enumerated above for a period of over two years. The issue, however, is not attendance but, instead, CT Page 15275 whether Maria learned from the multitude of services that were provided to her and addressed her behavioral deficiencies. When the children were returned after her completion of all of these services, she again failed to provide her children a safe and nurturing home. This resulted in Celso being severely beaten within three months of being reunified with his mother. Mother demonstrated a complete lack of progress in being able or willing to protect her children from physical abuse. No evidence was presented of other services that might have helped mother learn to be a competent parent. Whether, as the court believes, it was mother's boyfriend who inflicted Celso's injuries or whether it was the inappropriate babysitter mother had chosen to leave the children with, Maria simply failed to take the precautions necessary to make sure that her children remained safe. Given all the services that were provided to the mother and her failure to assimilate these services, the court finds by clear and convincing evidence that Maria has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in the lives of the children.
With regard to Celso S., the court finds by clear and convincing evidence that he has failed "to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). Celso, Cesar and Amarilys were removed by order of temporary custody in October of 1995. As of the filing of the Termination Petition, father had failed to complete any of the parenting classes, parent aid programs, anger management courses, or men support groups that were offered to him by DCF. Celso S. has made numerous excuses for failing to complete any of these programs. These excuses include his moving to Puerto Rico as part of a plan to reunite him with the children once DCF returned the children to the mother, his moving to Vernon to protect himself from the family of Maria's boyfriend and, finally, timing conflicts between his employment and these programs. The fact still remains, however, that this father by his own choice of priorities has not taken advantage of any of the services that would demonstrate a genuine, sustained effort by him to become a competent parent. Accordingly the court finds by clear and convincing evidence that he has failed to achieved such a degree of personal rehabilitation as would encourage the belief that he could assume a responsible position in the lives of the children. CT Page 15276
With regard to Magdiel E., the Department of Children and Families failed to offer or provide any services to him. Moreover, DCF would have been able to provide notice of the proceedings if its search had included contacting the Department of Corrections which is its' usual practice. This is particularly disturbing because DCF had Magdiel's incarceration record in its possession. Instead, DCF provided notification by publication in the newspaper on dates that Magdiel was incarcerated. Presumably, if Magdiel had been located by DCF in prison and given actual notice of the proceedings, he would have taken part in the neglect case and been represented by counsel. He also would have been given steps which would have provided him with a clear roadmap of what he would have needed to accomplish in order to be considered rehabilitated. Given DCF's failure to provide notice to Magdiel even though its own records clearly showed he was in prison and its failure to provide steps or visitation, it would be fundamentally unfair for this court to make a finding that Magdiel E. has failed to rehabilitate. Based on this unique set of facts, the petitioner has failed to prove by clear and convincing evidence that Magdiel has failed to rehabilitate within the meaning of the statute.
ABANDONMENT
Conn. Gen. Stat. § 17a-112 (c)(3)(A) provides that a ground for termination exists when "the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with the child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interests, concern or responsibility' for the welfare of the child." In re Magdalia M.,6 Conn. App. 194, 208-209 cert. denied, 199 Conn. 809 (1986). "Conversely, where a parent fails to visit a child, fails to display any level of affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. This statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
With regard to Magdiel E., the court finds by clear and convincing evidence that this father abandoned his children long before DCF even became involved with the family. There is no evidence that he had any continuing, reasonable degree of concern CT Page 15277 with regard to these children once he and Maria stopped having a relationship. In fact mother did not even know where he was.
There are five general obligations to parenthood: "(1) express love and affection for the child; (2) express personal concern over the health, education and general well being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." In reJuvenile Appeal (Docket No. 9489), 183 Conn. 11, 14 (1981); In reMichael M., 29 Conn. App. 112, 121 (1992).
The court is well aware that a parent's imprisonment alone does not constitute abandonment. In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431, 443, (1982). "The restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited resources for communication with ones children." In re JuvenileAppeal, supra at 443. This father never tried to contact the children or send them presents while he was incarcerated.
Moreover, there have been periods of time during these children's lives when the father was not incarcerated. There is no indication that this father provided the necessary food, clothing or medical care to sustain these children's well being. Additionally, as a result of his voluntary choices and conduct resulting in incarceration, he did not furnish appropriate social guidance to the children. While Magdiel did show up unannounced several times to say hello to the children while they were in foster care, this conduct does not rise to the level of expressing love and affection for the children in any continuing manner.
NO ONGOING PARENT/CHILD RELATIONSHIP
The Petition also alleges that Celso S. and Magdiel E. have no ongoing parent/child relationship that ordinarily develops as a result of the parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the children and to allow further time for the establishment or reestablishment of such a parent/child relationship would be detrimental to the best interests of the children. Conn. Gen. Stat. § 17a-112 (c)(3)(D).
The Connecticut Supreme Court in In re Jessica M., CT Page 15278217 Conn. 459 (1991) found that termination on these grounds is inappropriate unless "the child has no present memories or feelings for the natural parent"or that if such child does have some memories "no positive emotional aspects of the relationship survive." Id. at 468. The court cannot find by clear and convincing evidence that these children have no positive memories or feelings for their fathers. The evidence was clear that Celso, Cesar and Amarilys enjoy spending time with Celso S. during supervised visitation. Deana has specifically expressed interest in seeing her father. Yaritza and Magdiel know who their father is and there was insufficient evidence presented to find that no positive aspects of their relationship with their father survive.
MANDATORY FINDINGS
With respect to the mandatory factual findings required by Conn. Gen. Stat. § 17a-112 (e) except in the case where the termination is based on consent:
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. The court finds that DCF provided foster care for the children and offered Maria P. and Celso S. visitation. DCF also referred Maria P. and Celso S. to numerous programs to address their parenting deficiencies and also provided counseling regarding these deficiencies. These services were highly relevant to the needs of the parties and were offered in a timely manner. With regard to Magdiel E., as stated above, the court finds that DCF did not refer this parent to services and did not provide him with visitation. However this father knew that the children were in foster care and did not come forward to request services and/or visitation.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
The court finds that DCF offered Maria P. and Celso S. appropriate and timely services and guidance, and more than sufficient time to permit family reunification. With regard to Magdiel E., DCF did not offer this parent appropriate services and guidance because the agency was unaware of his whereabouts. However, Magdiel did not step forward as a possible resource and/or seek services to aid with reunification despite knowing CT Page 15279 that the children were in foster care.[4]
3. The terms of any applicable court order entered into and agreed to by any individual or agency on the parent, and the extent to which all parties have fulfilled their obligations under such order. Both Maria P. and Celso S. were provided with expectations and service agreements. As detailed above, DCF met its obligation to provide assistance to these parents. While Maria attended these programs and counseling, she did not make any progress in learning how to be a competent parent who could protect her children from physical abuse. With regard to Celso S., he did not fulfil or comply with the expectations. Magdiel E. was not provided with expectations.
4. The feeling and emotional ties of the children with respect to their parents, any guardian and any person who has exercised physical care, custody or control of the children for at least one year and with whom the children have developed significant emotional ties. All of the children are bonded and have significant emotional ties with their foster families. Deana, Magdiel, Celso and Cesar also have bonds with their mother. Celso and Cesar also have a bond with their biological father. Amarilys views her foster mother and father as her psychological parents. Yaritza does not have positive feelings for her mother or father.
5. Ages of the children: Deana is 13 years old. Yaritza is 11 years old. Magdiel is 9 years old. Celso is 7 years old. Cesar is 6 years old. Amarilys is 4 years old.
6. The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that Maria P. has made significant efforts to adjust her circumstances or conditions to facilitate reunification by engaging in numerous services and visitation with the children. However, she has not benefitted [benefited] from these services and apparently is incapable CT Page 15280 of doing so. With regard to Celso S., the court finds that he has been unsuccessful in making any meaningful or sustained attempt to adjust his circumstances, conduct or condition to facilitate reunification. He has not completed any of the programs or services that were offered to him. His visitation has been inconsistent with Amarilys. His visitation has been more consistent in recent years with Celso and Cesar except for a period of time when DCF prevented visitation. With regard to Magdiel E., with the exception of several visits while the children were in foster care, this father has not had contact with his children or provided any love or affection, concern for their health, education or well-being and has not provided a home or social or religious guidance for his children. He has also through his voluntary actions remained incarcerated for a significant period of these children's lives. The court believes that the children's need for permanency and stability in their lives far outweighs any interest that the father may have in becoming re-involved with these children when he is released from prison.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent. Maria P. did not face unreasonable interference from anyone. For a period of approximately one year, DCF did prevent visitation by Celso S. for reasons that are unclear from the record. However, the father did have visitation with the children over the remaining three years that the children were in foster care. With regard to Magdiel E., the Department of Children and Families did not prevent this father from visiting with his children during their first two years of foster care. However, the father did not come forward to seek visitation. During the summer of 1997, DCF did prevent any further visitation until the father contacted DCF. Magdiel E. chose not to do so. In fact, he has never requested visitation with his children.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5. CT Page 15281
Deana, Yaritza, Magdiel and Celso have all been diagnosed with post traumatic stress syndrome. Deana and Magdiel appear to be coping as a result of secure foster homes and numerous services including therapy and counseling. Yaritza, after spending a period of time in foster homes, has remained to this day in a hospitalization program to help address her mental health issues. She has not seen her mother since January of 1998 because of a strong recommendation by her therapist that there not be contact.
Yaritza's conduct prior to going into a hospitalization program included self mutilation, tearing out of her hair, reports of seeing the Devil, and fears that she would kill either her sister or herself. Her bizarre behavior would escalate after visits with her mother. By way of example, after she returned on one occasion from a visit complaining that her mother had not fed her, she proceeded to climb on top of the table lapping her food up like a dog. She also had ongoing fears that her mother was going to kill her or that her foster mother was going to leave her.
Deana and Magdiel have remained in the foster home of Juanita M. for the past four years. Amarilys has lived her entire life at this foster home except for less than one month when DCF tried to reunify her with her mother. Yaritza spent a period of time in Juanita's home before she needed to be hospitalized. The children are all clearly bonded with and love their foster mother. If allowed, this foster mother intends to adopt all four of these children including Yaritza. Deana has expressly stated that she would like to continue to live with Juanita. With regard to Magdiel, his behavior regresses when he sees his biological mother. Yaritza has not been able to visit with her mother for almost the last two years because her therapist found the visits were detrimental to her well-being. Recently, Yaritza has expressed interest in going back to live with Juanita.
Celso and Cesar have lived with Jackie B. for the last four years with the exception of the failed three month reunification effort. This means that they have spent more than half of their lives in this foster home. They are clearly bonded to and love Jackie. She wants to adopt the boys and considers them a part of her family. Celso and Cesar also have a bond with their biological parents. It was undisputed that the children enjoy their visits with their father and like to see him. There is a CT Page 15282 significant difference, however, between taking part in supervised visitation and handling the day to day stresses of being a full time parent. Unfortunately, Celso has chosen to not engage in any of the services necessary to help him become a competent parent despite having four years to do so. The safety of these children is a paramount concern. It is not in Celso and Cesar's best interest to return them to a father who has a history of severely beating children and who has not taken any of the necessary steps to address and correct this abusive behavior.
Based upon the foregoing findings, the court determines that it is in the children's best interests for a termination of parental rights to enter with respect to the mother, Maria P., and the male biological parents and accordingly a termination of their parental rights is ordered.[5] It is further ordered that the Commissioner of DCF be appointed statutory parent for these children for the purpose of securing adoptive homes. It is the court's directive that the foster parents receive first consideration. The commissioner shall file with this court no later than 90 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
CHASE THEODORA ROGERS JUDGE OF THE SUPERIOR COURT